IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:24-cv-00369-SBP

BRIAN KASSAL,

      Plaintiff,

v.

COLORADO DEPARTMENT OF CORRECTIONS;
CHARLES KUDLAUSKAS, in his individual capacity;
SARAH SCHRECONGOST, in her individual capacity;
MEGAN CASTILLO, in her individual capacity;
JENNIFER GRAHAM, in her individual capacity;
BETTY KASPAR, in her individual capacity; and
RONALD ARMSTRONG, in his individual capacity,

      Defendants.

---

## MEMORANDUM OPINION AND ORDER

---

**Susan Prose, United States Magistrate Judge**

      This matter is before the court on the Motion to Dismiss Plaintiff's Second Amended Complaint at ECF No. 58, filed by Defendants Colorado Department of Corrections ("CDOC"), Charles Kudlauskas, Sarah Schrecongost, Megan Castillo, Jennifer Graham, Betty Kaspar, and Ronald Armstrong (collectively, "Individual Defendants") (with CDOC, "Defendants"). ECF No. 58 ("Motion" or "Motion to Dismiss"). Plaintiff Brian Kassal, who was formerly incarcerated at CDOC's Buena Vista Correctional Facility ("BVCF"), filed a response, ECF No. 63, and Defendants filed a reply, ECF No. 65. The undersigned presides over the matter with the parties' consent pursuant to 28 U.S.C. § 636(c)(1). ECF No. 28 (consent form); ECF No. 29 (Order of Reference).

For the reasons that follow, having carefully considered the briefing, the well-pleaded

facts, and the applicable law, the court respectfully **ORDERS** that the Motion be **GRANTED IN**

**PART and DENIED IN PART**.

## BACKGROUND

Plaintiff raises the following allegations in his Second Amended Complaint (ECF No. 53)

("SAC" or "Complaint"), the operative pleading in this matter:

***Plaintiff's accident and subsequent medical treatment.*** In the fall of 2021, Plaintiff, who

was then incarcerated at BVCF, was selected for CDOC's Transitional Work Opportunity

Program, known as the "Take TWO" program. SAC ¶ 11. Take TWO participants receive

enhanced living conditions and are permitted to work off-site for local employers to promote

self-sufficiency prior to release from custody. *Id.* ¶¶ 11, 12, 49, 54. Plaintiff initially worked for a

local restaurant but was later reassigned to work with "a local roofing contractor," despite his

lack of roofing experience. *Id.* ¶¶ 12, 14–17. Although Plaintiff expressed concerns about

working as a roofer, he agreed to the reassignment to remain in the Take TWO program and

continue saving money. *Id.* ¶ 17.

By December 2021, Plaintiff's prison-issued work boots had begun to fall apart, with the

sole of the right boot tearing and making it difficult for him to balance on roofs. *Id.* ¶¶ 18–19. On

January 31, 2022, he slipped and sprained his right elbow. *Id.* ¶ 20. On February 7, 2022,

Plaintiff requested replacement boots, but his requests to use facility supplies or have the cost

deducted from his account were denied. *Id.* ¶¶ 21–28. The next day, February 8, 2022, while

working on a roof, Plaintiff slipped and fell approximately twelve feet onto a concrete slab. *Id.*

¶ 29. Plaintiff was taken to Heart of the Rockies Regional Medical Center in Salida, Colorado,

where imaging showed a navicular fracture in the left foot, a pelvic fracture, a right-ankle sprain, and a broken right arm. *Id.* ¶¶ 30–31, 36.

Because BVCF did not have an infirmary,[1] Plaintiff was transferred to the Colorado Territorial Correctional Facility in Cañon City, Colorado, where he asserts that he remained nearly "two weeks with no surgery or treatment." *Id.* ¶¶ 32–33. However, he also contends that on February 18, 2022—ten days after the fall—he in fact underwent surgery at Parkview Medical Center in Pueblo, Colorado, where a surgeon named Jamie Engel repaired a comminuted intra-articular fracture of Plaintiff's right radius and a closed displaced fracture of the navicular bone in his left foot, the repair of which required the insertion of pins. *Id.* ¶¶ 34–36. Plaintiff was discharged from Parkview the same day as the surgery with instructions that "he should receive physical and occupational therapy, a CT scan, and that he have a follow-up appointment with Dr. Engel in two [] weeks." *Id.* ¶ 37. Plaintiff was transported back to the prison in Cañon City, by officers who allegedly treated him poorly, *id.* ¶ 38, but those unnamed individuals have not been

---

[1] The court notes some ambiguity in Plaintiff's use of the term "infirmary" throughout his pleading. On the one hand, he asserts that BVCF has no infirmary. ECF No. 53 ¶ 32. On the other, he alleges that he "repeatedly" went to the infirmary at BVCF after he was returned to that institution. *Id.* ¶ 70. While less than perfectly clear, the pleading plausibly suggests that the prison in Cañon City was a more "appropriate facility" for an inmate with acute-care needs. Indeed, publicly-available information of which this court may take judicial supports that point. *See* https://cdoc.colorado.gov/facilities/canon-city/colorado-territorial-correctional-facility (noting that the institution "has an infirmary unit that houses inmates from different facilities throughout the state with acute medical and mental health needs. The health services team provides 24/7 care to the inmate population.") (last visited September 22, 2025); *see also Doe v. Heil*, 533 F. App'x 831, 833 n.22 (10th Cir. 2013) (taking judicial notice of fact obtained from CDOC's website) (citing *N.M. ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 702 n.2 (10th Cir. 2009)); Fed. R. Evid. 201(b)(2) (stating that judicial notice may be taken of a fact that is "not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot readily be questioned").

sued in this case.

Consistent with Dr. Engel's instructions, Plaintiff was transported back to Parkview for a follow-up appointment on March 2, 2022, twelve days after his surgery. *Id.* ¶ 40. At that time, he was scheduled for another appointment on March 16, 2022, to remove the pins in his ankle, *id.* ¶ 41, but before then, he was moved back to BVCF. *Id.* ¶ 42 (Plaintiff was returned to BVCF on March 10, 2022). Plaintiff avers that he was not taken to the appointment because three BVCF employees—Castillo, a correctional officer, Graham, the medical scheduler, Program Director Armstrong, and Health Services Administrator ("HSA") Kaspar, all of whom bore responsibility for transporting inmates to outside medical facilities and had the ability to cancel medical appointments—"decided that it was too inconvenient to drive Mr. Kassal the two hours to Pueblo for his appointment and canceled" the March 16, 2022 appointment. *Id.* ¶¶ 59-66.

After these four individuals allegedly canceled the pin-removal appointment, Plaintiff's ankle "began to turn colors and smell," *id.* ¶ 69, prompting him to "repeatedly" go to the infirmary at BVCF and ask "when he would be brought to see his surgeon for the CT scan and removal of the pins as required." *Id.* ¶ 70. Specifically, Plaintiff asked these questions of two medical providers at BVCF: Schrecongost, a nurse, and Kudlauskas, a physician assistant. *Id.* ¶¶ 3, 4, 71. Schrecongost and Kudlauskas, Plaintiff contends, "would have shared these concerns with Defendant Kaspar as Ms. Kaspar was the head Health Service Administrator." *Id.* ¶ 72. But instead of ensuring that he was transported to Dr. Engel's office in Pueblo for the pin-removal, all six of the Individual Defendants—Schrecongost and Kudlauskas, but also Castillo, Graham, Kaspar, and Armstrong—did nothing except "schedule[] him for a daily cleaning of his wound." *Id.* ¶¶ 73-78. In addition to that, five of the Individual Defendants (Castillo, Graham, Kaspar,

4

Schrecongost, and Kudlauskas) "retaliated against [Plaintiff's] repeated requests and refused these complaints as a reason to refuse [his] medical treatment." *Id.* ¶¶ 80-85.

At some unidentified time in March 2022—whether before or after the scheduled March 16 appointment with Dr. Engel is unclear from the Complaint—Charmaine Kassal, Plaintiff's mother, emailed the prison asking that he receive treatment because the "pins or staples [are] protruding from his skin with blood." *Id.* ¶ 85. Plaintiff asserts that Kaspar received this email, *id.* ¶ 86, although the screenshot of the email he incorporates in his pleading does not show the identity of the recipient. *Id.* ¶ 85.

On April 17, 2022—one month after the date Plaintiff was to have a follow-up appointment with the surgeon—Plaintiff filed a grievance purportedly informing Castillo, Graham, Jere Hammer,[2] Armstrong, Schrecongost, "and/or" Kudlauskas about his situation. *Id.* ¶ 88. In that document, Plaintiff stated that he had "not been to Pueblo to see the Doctor in charge of my surgeries. I was scheduled for another scan – in prep for another surgery on my left foot – before I was moved . . . . Additionally . . . one of the two pins in my foot has abruptly come alarmingly loose. A fact first noted by medical on March 25th, 2022." *Id.* ¶ 88. Defendants attach a copy of this grievance to their Motion to Dismiss, ECF No. 58-1, which also includes the April 26, 2022 CDOC response written by Kudlauskas, in which he states that Plaintiff "has been a 'No Show' for most of his scheduled medical appointments to include the scheduled provider follow up appointment," *id.*—presumably, the March 16, 2022 post-surgical follow-up with Dr.

---

[2] Kaspar has been substituted for Hammer, who was previously a defendant in this action. *See* ECF Nos. 8, 53.

Engel.[3]

Five days after Plaintiff submitted the grievance, on April 22, 2022, his mother again contacted the prison by email, stating that Plaintiff was taking it upon himself to "remov[e] his arm cast little by little," cannot bend his arm, still has pins in his foot, that he "hurts," and that "he is getting no help no physical therapy." *Id.* (cleaned up). The recipient of the email is listed as "cdoc." *Id.*

On April 27, 2022, Plaintiff finally saw Dr. Engel, who apparently removed the rest of his cast and the pins from his ankle at that time. *Id.* ¶¶ 92, 105. Dr. Engel's notes from that date

---

[3] Plaintiff vigorously objects to Kudlauskas's response in the grievance document being considered in the court's evaluation of the Motion to Dismiss. He argues that the Complaint never references the *response* to the grievance, save to say that it was denied, and that the grievance is "in no way central to [his] claims." *See* ECF No. 63 at 3; *see also Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010) (court may consider "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity") (quoting *Jacobsen v. Desert Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002)). The objection is not well taken. In taking this position, Plaintiff seeks to have it both ways: he wants the court to take into account specific quotations from the document when it suits his purposes (i.e., to show that he complained to prison personnel on April 17, 2022, that he had not yet been seen by his surgeon), but to have the court ignore it when it is contrary to his self-interest (i.e., that Kudlauskas responded that Plaintiff was a "no show" for that appointment). In light of Plaintiff's selectively incorporating quotations from the document in his pleading, the court will not disregard the document, but will adhere to its obligation to draw *all* reasonable factual inferences from it in Plaintiff's favor. *United States ex rel. Heron v. Nationstar Mortg., LLC*, No. 21-1362, 2024 WL 3770843, at *3 (10th Cir. Aug. 13, 2024), *cert. denied*, 145 S. Ct. 1921 (2025) (courts are obliged to take "'all facts alleged in the complaint . . . as true' and indulge 'all reasonable inferences . . . in favor of the plaintiff'") (quoting *GF Gaming Corp.* v. *City of Black Hawk*, 405 F.3d 876, 881 (10th Cir. 2005)); *cf. United States v. Wade*, No. 2:15CV00883 DS, 2017 WL 11407521, at *1 (D. Utah Apr. 17, 2017) ("Though a district court may consider documents attached to a motion to dismiss, the court may not rely on these documents to refute factual allegations *other than allegations confined to the contents of those documents*.") (citing *Gee*, 627 F.3d at 1186) (emphasis added).

included the following information, which Plaintiff alleges was sent to Kaspar, Schrecongost,

and Kudlauskas:

> He is also 10 weeks status post ORIF of a right distal radius fracture with DRUJ
> pinning. The patient is in prison at this time. He was supposed to follow-up 2 weeks
> after his last visit for pin removal. [Prison] did not bring him back until today which
> is 2 months later. He has had the pins the entire time. He was also supposed to get
> a CT scan. The patient has been contacted multiple times about this.
>
> **It has been 8 weeks since I ordered [a follow up and CT scan] the first time
> and 6 weeks since I ordered it the second . . . . He needed his pins out 6 weeks
> ago. When you don't follow my instructions, you are not only risking long term
> negative outcomes for the patient, you are also making my job significantly
> harder**.

*Id.* ¶¶ 92, 100 (cleaned up) (emphasis added). In the notes of Dr. Engel's encounter with Plaintiff

on April 27, 2022, she also stated Plaintiff needed to "start PT for range of motion," but Plaintiff

alleges that from March 2022 through his release from custody in August 2022, he "was never

provided a physical therapist." *Id.* ¶ 99. At some point in time, "[a]fter many months of

complaints and grievances," Plaintiff was provided therapy in the form of being allowed to use a

squeeze ball and resistance band one hour per week. *Id.* ¶ 111.

Related to Dr. Engel's statements concerning a lack of response to her directives, Plaintiff

alleges that BVCF maintained no medical treatment notes for him from February through June

2022 and that HSA Kaspar was responsible for recordkeeping and ensuring access to outside

care. *Id.* ¶¶ 113-14. The consequences of this alleged indifference to Plaintiff's serious medical

needs were that he was subjected to pain during the two-month period between his surgery and

the removal of the cast and pins in late April 2022, and that his "ankle and wrist are severely

limited and medical diagnoses have determined that he will never regain complete function as a

result of the lack of access to physical therapy in the six (6) months following his surgery." *Id.* ¶¶ 104, 112, 134.

**Plaintiff's removal from the Take TWO Program.** Recall that Plaintiff returned to BVCF on March 10, 2022, after he spent some time recuperating in the infirmary at the prison in Cañon City. *Id.* ¶ 42. At the time of his return to BVCF, Plaintiff was confined to a wheelchair because he could not walk "and was unable to use his right hand well." *Id.* ¶ 46. Plaintiff was informed that, because of his disability, he would not be permitted to continue in the Take TWO program or to reside in Take TWO facilities, which he asserts provided "much lower levels of security" and "a better standard of living. Indeed, the Take TWO housing was outside of the fence at the Buena Vista Correctional Complex." *Id.* ¶¶ 49-50.

In short, according to Plaintiff, he was "regressed to a higher level of security and less freedom on account of his disability." *Id.* ¶ 53. "[F]or several months, he requested reinstatement to the Take TWO program and work accommodations for his disability. *Id.* ¶¶ 116–117. After Plaintiff began citing the Americans with Disabilities Act in his complaints to prison officials, he was returned to Take TWO within a week and assigned work compatible with his limitations. *Id.* ¶ 118.

**Plaintiff's claims in this litigation.** Based on these allegations, Plaintiff brings Eighth Amendment claims against the Individual Defendants, in their individual capacities only, pursuant to 42 U.S.C. § 1983, premised on the contention that they were deliberately indifferent to his serious medical needs. ECF No. 58 ¶¶ 3-8, 119-138. He further asserts that, by discriminating against him on the basis of his disability and denying him meaningful access to the Take TWO program, CDOC violated both Title II of the Americans with Disabilities Act

("ADA"), 42 U.S.C. § 12131 *et seq.*, and Section 504 of the Rehabilitation Act of 1973 ("RA"), 29 U.S.C. § 794. *Id.* ¶¶ 135-146.

Defendants move to dismiss the Complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6). *See generally* ECF No. 58. The court addresses the plausibility question for each claim, in turn.

## ANALYSIS

### I.    Deliberate Indifference Claims (Claims One and Two)

In these § 1983 claims, Plaintiff alleges that the Individual Defendants violated his Eighth Amendment rights by exhibiting deliberate indifference to his serious medical needs—specifically, by failing to provide necessary post-surgical care and by preventing him from obtaining the physical and occupational therapy he needed to restore him to full functioning after the accident. ECF No. 53 ¶¶ 119-138. Each Individual Defendant invokes qualified immunity, ECF No. 58 at 12-13, and so the court frames its analysis in terms of that defense. *See, e.g.*, *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam) ("[W]e repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation."); *Weise v. Casper*, 507 F.3d 1260, 1265 (10th Cir. 2007) (recognizing that "a district court cannot avoid ruling on the merits of a qualified immunity defense when it can resolve the purely legal question of whether a defendant's conduct, as alleged by plaintiff, violates clearly established law"); *Sterling Hotels, LLC v. McKay*, 71 F.4th 463, 466 (6th Cir. 2023) (recognizing that "when a defendant moves to dismiss on qualified-immunity grounds, district courts cannot 'avoid ruling on the issue'") (quoting *Summers v. Leis*, 368 F.3d 881, 886 (6th Cir. 2004)); *Woodson v. Armor Corr. Health Servs., Inc.*, No. 20-cv-00186-RM-KMT, 2020 WL 4041460, at *3 (D. Colo. July

17, 2020) ("The Tenth Circuit has made clear that 'qualified immunity questions should be resolved at the earliest possible stage in litigation.'") (quoting *Schwartz v. Booker*, 702 F.3d 573, 579 (10th Cir. 2012), quoting *Hunter*, 502 U.S. at. 224, 227) (1991)); *cf. Siegert v. Gilley*, 500 U.S. 226, 231 (1991) ("Until this threshold [qualified] immunity question is resolved, discovery should not be allowed.").

### A.    Legal Standards

#### 1.    Federal Rule of Civil Procedure Rule 12(b)(6)

Pursuant to this Rule, defendants can move to dismiss a complaint for "failure to state a claim upon which relief can be granted." In deciding a motion under Rule 12(b)(6), the court must "'accept as true all well-pleaded factual allegations . . . and view these allegations in the light most favorable to the plaintiff.'" *Casanova v. Ulibarri*, 595 F.3d 1120, 1124-25 (10th Cir. 2010) (alteration in original) (quoting *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009)). Nevertheless, a plaintiff may not rely on mere labels or conclusions, "and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citation omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Rather, to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (internal quotation marks omitted). A claim is facially plausible when the plaintiff pleads factual content that, when taken as true, "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

The *Twombly/Iqbal* pleading standard first requires the court to identify which allegations

"are not entitled to the assumption of truth" because, for example, they state legal conclusions or merely recite the elements of a claim. *Id.* at 679. It next requires the court to assume the truth of the well-pleaded factual allegations "and then determine whether they plausibly give rise to an entitlement to relief." *Id.* In this inquiry, courts "disregard conclusory statements and look only to whether the remaining factual allegations plausibly suggest the defendant is liable." *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012). The ultimate duty of the court is to "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed." *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

### 2.    Deliberate Indifference to Serious Medical Needs

"The Supreme Court has explained that 'the treatment a prisoner receives . . . and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.'" *Contreras on behalf of A.L. v. Dona Ana Cnty. Bd. of Cnty. Commissioners*, 965 F.3d 1114, 1116 (10th Cir. 2020) (quoting *Helling v. McKinney*, 509 U.S. 25, 31 (1993)) (Tymkovich, J., concurring). Among the affirmative obligations the Eighth Amendment imposes on prison officials is to provide adequate medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) ("A prison official's deliberate indifference to an inmate's serious medical needs is a violation of the Eighth Amendment's prohibition against cruel and unusual punishment."). A prisoner who believes himself the subject of deliberate indifference at the hands of prison officials may seek redress under § 1983. *Contreras*, 965 F.3d

at 1117 (citing *Estelle v. Gamble*, 429 U.S. 97, 104-06 (1976)).

The "'deliberate indifference standard lies 'somewhere between the poles of negligence at one end and purpose or knowledge at the other.'" *Est. of Beauford v. Mesa Cnty., Colorado*, 35 F.4th 1248, 1262 (10th Cir. 2022) (quoting *Mata*, 427 F.3d at 751). To establish deliberate indifference to his medical needs, a plaintiff must plead non-conclusory facts which plausibly support both an objective component and a subjective component. *Requena v. Roberts*, 893 F.3d 1195, 1215 (10th Cir. 2018). That is, the well-pleaded facts must allow the court reasonably to infer that each defendant was "subjectively aware" of an objectively serious medical need and "recklessly disregarded that risk." *Wilson v. Falk*, 877 F.3d 1204, 1209 (10th Cir. 2017) (cleaned up).

"The objective component of deliberate indifference is met if the 'harm suffered rises to a level 'sufficiently serious' to be cognizable under the Cruel and Unusual Punishment Clause.'" *Burke v. Regalado*, 935 F.3d 960, 992 (10th Cir. 2019) (quoting *Mata*, 427 F.3d at 753). A plaintiff who alleges a denial of medical care must "produce objective evidence that the deprivation at issue was in fact sufficiently serious." *Estate of Booker v. Gomez*, 745 F.3d 405, 430 (10th Cir. 2014) (internal quotation marks omitted). "'A medical need is objectively serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Clark v. Colbert*, 895 F.3d 1258, 1267 (10th Cir. 2018) (quoting *Martinez v. Garden*, 430 F.3d 1302, 1304 (10th Cir. 2005) (cleaned up)). If "the claim involves a delay in treatment, [a plaintiff] ha[s] to show 'that the delay resulted in substantial harm[.]'" *Vasquez v. Davis*, 882 F.3d 1270, 1275 (10th Cir. 2018) (quoting *Al-Turki v. Robinson*, 762 F.3d 1188, 1193 (10th Cir.

2014)). A showing of "lifelong handicap, permanent loss, or considerable pain" may satisfy the substantial harm requirement. *McCowan v. Morales*, 945 F.3d 1276, 1291 (10th Cir. 2019) (citing *Requena*, 893 F.3d at 1216).

"To satisfy the subjective component, the plaintiff must show that the defendant knew that the plaintiff faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it." *Estate of Lockett by & through Lockett v. Fallin*, 841 F.3d 1098, 1112 (10th Cir. 2016) (internal quotation marks omitted). Ultimately, to allege a culpable mindset, a plaintiff must plead facts showing that a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Walker v. Mohiuddin*, 947 F.3d 1244, 1249 (10th Cir. 2020) (quoting *Farmer*, 511 U.S. at 837). "The subjective component is akin to 'recklessness in the criminal law,' where, to act recklessly, a 'person must 'consciously disregard' a substantial risk of serious harm.'" *Self v. Crum*, 439 F.3d 1227, 1231 (10th Cir. 2006) (quoting *Farmer*, 511 U.S. at 837, 839).

"'[T]he subjective component can be satisfied under two theories: failure to properly treat a serious medical condition ('failure to properly treat theory') or as a gatekeeper who prevents an inmate from receiving treatment or denies access to someone capable of evaluating the inmate's need for treatment ('gatekeeper theory').'" *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1137 (10th Cir. 2023) (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2000)). The gatekeeper theory "'can apply to medical professionals when the professional knows that his or her role in a medical emergency is solely to refer the patient to another.'" *Id.* (quoting *Sealock*, 58 F.4th at 1137). "Even a brief delay in treatment can be unconstitutional." *Id.* (citing

*Mata*, 427 F.3d at 755). However, prison officials do not "act with deliberate indifference when they provide medical treatment even if it is subpar or different from what the inmate wants." *Lamb v. Norwood*, 899 F.3d 1159, 1162 (10th Cir. 2018). It has long been established that "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106. Nor does an inmate have a constitutional right to a particular course of treatment. *See, e.g.*, *Callahan v. Poppell*, 471 F.3d 1155, 1160 (10th Cir. 2006).

In addition to the two-part inquiry for deliberate indifference, allegations of "personal participation in the specific constitutional violation complained of [are] essential" in a § 1983 action. *See Henry v. Storey*, 658 F.3d 1235, 1241 (10th Cir. 2011). To establish personal participation, the plaintiff must allege specific facts to show that each individual defendant caused the deprivation of a federal right. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985); *Trujillo v. Williams*, 465 F.3d 1210, 1228 (10th Cir. 2006) ("In order for liability to arise under § 1983, a defendant's *direct personal responsibility* for the claimed deprivation . . . must be established.") (emphasis added). A supervisory defendant may not be held liable for the unconstitutional conduct of his subordinates on a theory of respondeat superior. *Iqbal*, 556 at 676.

### 3.    Qualified Immunity

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (quoting *White v. Pauly*, 580 U.S. 73, 78-79 (2017) (internal quotation marks omitted)); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (under the doctrine, "government officials performing discretionary functions generally are

shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known"). Thus, to survive a motion to dismiss under Rule 12(b)(6) "where a qualified immunity defense is implicated, the plaintiff 'must allege facts sufficient to show (assuming they are true) that the defendants plausibly violated their constitutional rights[.]'" *Hale v. Duvall*, 268 F. Supp. 3d 1161, 1164 (D. Colo. 2017) (quoting *Robbins*, 519 F.3d at 1249).

To overcome the defense, "the onus is on the plaintiff to demonstrate (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Surat v. Klamser*, 52 F.4th 1261, 1270-71 (10th Cir. 2022) (quotations omitted); *Cummings v. Dean*, 913 F.3d 1227, 1239 (10th Cir. 2019) (same). The court has "discretion to decide the order in which to engage the two prongs of the qualified immunity standard." *Andersen v. DelCore*, 79 F.4th 1153, 1163 (10th Cir. 2023) (cleaned up). Regardless of the order, "if the plaintiff fails to establish either prong of the two-pronged qualified-immunity standard, the defendant prevails on the defense." *A.M. v. Holmes*, 830 F.3d 1123, 1134-35 (10th Cir. 2016); *see also Andersen*, 79 F.4th at 1163 (if the court "conclude[s] that the plaintiff has not met his burden as to either part of the two-prong inquiry, [the court] *must grant qualified immunity* to the defendant") (citing *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001) (emphasis added)). Stated in a slightly different way, "'[t]he record must clearly demonstrate the plaintiff has satisfied his heavy two-part burden; otherwise, the defendants are entitled to qualified immunity.'" *Felders ex rel. Smedley v. Malcom*, 755 F.3d 870, 877-78 (10th Cir. 2014) (quoting *Medina*, 252 F.3d at 1128).

As for the clearly established prong, an official's conduct violates clearly established law

when, at the time of the challenged conduct, "the contours of a right are sufficiently clear that *every reasonable official* would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (cleaned up) (emphasis added). "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)); *see also Pahls v. Thomas*, 718 F.3d 1210, 1227 (10th Cir. 2013) (qualified immunity, "by design, 'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions'") (quoting *al-Kidd*, 563 U.S. at 743).

For the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision "on point," or the "clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Halley v. Huckaby*, 902 F.3d 1136, 1149 (10th Cir. 2018) (quotation omitted). "The Supreme Court has 'repeatedly told courts not to define clearly established law at a high level of generality since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.'" *Est. of B.I.C. v. Gillen*, 761 F.3d 1099, 1106 (10th Cir. 2014) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)). While a plaintiff is not required to cite a case with "identical facts" to demonstrate a clearly established right, *Kapinski v. City of Albuquerque*, 964 F.3d 900, 910 (10th Cir. 2020), clearly established law must place the constitutional issue "beyond debate." *Mullenix*, 577 U.S. at 12 (quoting *al-Kidd*, 563 U.S. at 741). It is the plaintiff's obligation to cite to cases that satisfy the burden of demonstrating the asserted law is clearly established. *Thomas v. Durastanti*, 607 F.3d 655, 669 (10th Cir. 2010) ("The plaintiff bears the burden of citing to us what he thinks constitutes clearly established law.").

**B.    Delay in Post-Surgical Care (Claim One)**

Claim One targets all six Individual Defendants for allegedly interfering with Plaintiff's access to post-surgical follow-up appointments to timely remove pins in his ankle and to receive additional CT scans and treatment, resulting in a permanent loss of function in his ankle and wrist. SAC ¶¶ 119-128. The court will separately analyze these claims as against Schrecongost and Kudlauskas, followed by Kaspar, and then Castillo, Graham, and Armstrong.

**1.    Claim Against Schrecongost and Kudlauskas**

**a.    Objective Component**

As an initial matter, Defendants do not explicitly argue that Plaintiff's pleading fails to satisfy the objective prong of the deliberate indifference test. *See generally* ECF No. 58 at 7-10 (no reference to the objective seriousness of Plaintiff's claimed medical issues in addressing Claim One); ECF No. 63 at 4-6 (same, in reply brief). The lack of any meaningful assessment of the objective prong represents an implicit concession that Plaintiff's pleading is sufficient to meet this component. *See, e.g.*, *United States v. Walker*, 918 F.3d 1134, 1151, 1152 (10th Cir. 2019) (stating that arguments advanced only "in a perfunctory manner" may be deemed waived). In any event, the SAC plausibly alleges the objective prong: Dr. Engel's diagnosis of multiple fractures—including one repaired with surgical pins—together with the surgeon's explicit instructions for prompt follow-up, CT imaging, and physical and occupational therapy, readily satisfies this element. SAC ¶¶ 34–37, 48, 92, 99.

**b.    Subjective Component**

What remains at issue, then, is the subjective component: whether the Complaint plausibly alleges that Schrecongost and Kudlauskas knew of and disregarded a substantial risk,

either by failing to treat or by acting as gatekeepers.

The Individual Defendants collectively argue the Complaint is deficient for four distinct reasons. First, they contend the SAC does not actually allege that a post-surgical follow-up appointment with Dr. Engel was scheduled for March 16, 2022. Second, even assuming such an appointment existed, they assert the Complaint fails to allege that any cancellation was within Defendants' control or that they did not act with reasonable promptness to secure a replacement appointment. Third, they point to the April 17, 2022 grievance response, which—according to Defendants—records Plaintiff as a "no-show" rather than reflecting a cancellation. Fourth, they maintain that arranging daily wound cleaning while awaiting Dr. Engel undermines any plausible inference of culpable intent. *See* ECF No. 58 at 7–10. The Individual Defendants characterize Plaintiff's allegations as a "patchwork of suppositions" and sum up the shortfalls in the Complaint by asserting that it rests on "the alleged cancellation of one appointment causing the delay of a follow-up appointment," which, "without more, and without facts providing additional inculpatory context, is not sufficient to state a claim against the Individual Defendants for a failure to provide, or a delay in providing, medical care." *Id.* at 8, 10.

As to Schrecongost and Kudlauskas, the court respectfully finds that these arguments do not acknowledge or meaningfully engage with the well-pleaded facts in the Complaint. Drawing the required inferences in Plaintiff's favor, *see Iqbal*, 556 U.S. at 678, the Complaint plausibly alleges the subjective prong and states a deliberate indifference claim against Schrecongost and Kudlauskas under both failure-to-treat and gatekeeper theories. According to the Complaint, Schrecongost and Kudlauskas are the medical professionals at BVCF designated to provide

Plaintiff medical care.[4] Plaintiff alleges that he "repeatedly shared" concerns directly with these providers about the failure to promptly remove the pins and the fact that his ankle had "[begun] to turn colors and smell." ECF No. 53 ¶¶ 69-71. Despite this repeated notice, Schrecongost and Kudlauskas arranged only daily wound cleaning. *Id.* ¶¶ 77-78. What was medically necessary, Plaintiff avers, was transport to the office of the surgeon who could address the source of his wounds by removing the pins—a task the court infers did not lie within Defendants' scope of practice—and ensure that Plaintiff received the CT scan which would be used to determine whether he needed a second surgery. *Id.* ¶ 35 (alleging that Engel told Plaintiff "that he would likely require a second surgery on his ankle based on the severity of his injury"); *id.* ¶ 94 (asserting that, from February through late April 2022, Schrecongost and Kudlauskas "knew that Mr. Kassal required further medical care, . . . yet refused to take him back to the hospital for his required post-operative follow up exams"). Plaintiff repeatedly brought forward his concerns about the protruding surgical pins and the need to be seen by his surgeon. *Id.* ¶ 70.

Plaintiff thus has plausibly alleged the need for further, specific treatment and that he informed Schrecongost and Kudlauskas of the necessity for that treatment. Yet, Plaintiff was not transported from the institution to Dr. Engel's office until April 27, 2022 (after he filed a grievance on April 17, 2022), which prompted a rebuke from the surgeon about the six-week delay and a warning of "long term negative outcomes for the patient." ECF No. 53 ¶ 100 (cleaned up). Taking the factual allegations as true as it must at this stage, the court finds that both Schrecongost and Kudlauskas knew of and yet disregarded a substantial risk of serious

---

[4] Schrecongost and Kudlauskas are not alleged to have canceled any outside medical appointments for Plaintiff .

harm to Plaintiff. *See Martinez v. Beggs*, 563 F.3d 1082, 1089-90 (10th Cir. 2009) (explaining the subjective component requires that the defendants subjectively disregard the claimed harm, which the court may infer from circumstantial evidence or the obviousness of the risk); *see also Redmond v. Crowther*, 882 F.3d 927, 940 (10th Cir. 2018) ("The subjective prong is met if prison officials intentionally deny or delay access to medical care or intentionally interfere with the treatment once prescribed.") (internal brackets and quotation marks omitted).

Likewise, the Complaint plausibly alleges that Schrecongost and Kudlauskas acted with conscious disregard under a gatekeeper theory. An outside specialist—the surgeon—directed that Plaintiff be returned to her care for post-surgical treatment, and an appointment was scheduled. Because Schrecongost and Kudlauskas could not themselves provide that care, they had a duty "to refer or otherwise afford access to medical personnel capable of evaluating a patient's treatment needs"—here, Plaintiff's surgeon. *See Lucas*, 58 F.4th at 1139. The well-pleaded facts thus indicate that this referral was not an option to consider, but was affirmatively required. "Thus, viewed holistically, the complaint plausibly suggests" that Schrecongost and Kudlauskas "had a duty in this potential emergent situation to ask as [gatekeepers] and refer [Plaintiff] to medical personnel capable of treating [his] condition." *Lucas*, 58 F.4th at 1143 (citing *Sealock*, 218 F.3d at 1211); *see also Paugh v. Uintah Cnty.*, 47 F.4th 1139, 1159 (10th Cir. 2022) (recognizing that "when a jail official knows, or 'refuse[s] to verify underlying facts that he strongly suspected to be true, or decline[s] to confirm inferences of risk that he strongly suspected to exist' about an inmate's serious medical need, the official's failure to obtain medical assistance constitutes deliberate indifference") (quoting *Farmer*, 511 U.S. at 843 n.8) (citations omitted).

20

Defendants' counter-arguments are unavailing and do not persuade the court to reach a different conclusion. Taking into account the well-pleaded facts in total, the court finds no basis to countenance the argument that no follow-up medical appointment for Plaintiff to see Dr. Engel was "ever made," ECF No. 58 at 4, a contention that is difficult to understand in light of a contrary fact explicitly articulated in the Complaint. ECF No. 53 ¶ 41. Nor does the fact that the appointment was scheduled on March 2 while Plaintiff was still at the Cañon City facility absolve BVCF medical personnel—once they assumed his care—of the duty to apprise themselves of, and act on, the medical needs of a newly readmitted, post-operative inmate who was fresh off surgery to repair the serious injuries he sustained in a prison-work-related accident. *See Paugh*, 47 F.4th at 1159.

With respect to Defendants' reliance on Kudlauskas' notation in the April 17, 2022 grievance response that Plaintiff was a "no show" for "the scheduled provider follow-up appointment" (ECF No. 58-1), the court must view that statement in the context of a motion to dismiss. First, it is devoid of factual specifics concerning the reasons for Plaintiff's alleged non-appearance. Whether Plaintiff declined to attend or—given his allegation that he was wheelchair-bound upon return to BVCF (ECF No. 53 ¶ 46)—was unable to reach transport, is a factual question that cannot be resolved at this stage. At present, the court accepts Plaintiff's allegations that the March 16, 2022 appointment was canceled and not rescheduled for weeks, and only after repeated complaints, as true. Accordingly, the "no show" notation is insufficient to overcome the well-pleaded allegations plausibly showing a substantial delay in post-surgical specialist care. At most, Defendants identify a factual dispute about Plaintiff's cooperation that cannot be resolved

on a motion to dismiss.[5]

Lastly, the fact that Schrecongost and Kudlauskas cleaned the wounds around the surgical pins does not mean that they did not exhibit conscious disregard. According to the Complaint, these Defendants were aware of the long-delayed appointment to remove those pins, as directed by the physician who performed the surgery, along with Plaintiff's worsening symptoms, including the discoloration of his ankle, the smell exuding from the wounds, and the assertion that the aging surgical pins had become "alarmingly loose" (ECF No. 53 ¶ 88). Taking as true these well-pleaded facts, Plaintiff has plausibly alleged that Schrecongost and Kudlauskas responded "to an obvious risk with treatment that [was] patently unreasonable" *Self*, 439 F.3d at 1232; *see also Lucas*, 58 F.4th at 1139 ("providing only *some* modicum of treatment is not sufficient to absolve [defendants] from liability for potential deliberate indifference to [plaintiff's] serious medical concerns") (quotation omitted) (alterations in original). At this stage of the case, the court finds that the Complaint plausibly pleads that Schrecongost and Kudlauskas consciously disregarded a substantial risk of serious harm to an immediate post-surgical patient, whose surgeon had ordered that surgical hardware be removed weeks earlier than it was.

In summary, Plaintiff has plausibly alleged a conscious disregard to a substantial risk of serious harm to his health, under both failure-to-treat and gatekeeper theories, and thus states a

---

[5] The court is not insensitive to Defendants' desire for the court to appreciate the existence of the broader context, from their perspective, including that Plaintiff's own actions may have hindered his ability to obtain medically necessary post-surgical treatment. Evidence produced in discovery may support Defendants' position and undermine Plaintiff's view of the case. "However, a definitive resolution is not the issue" before this court at this time, and this Order should not be construed as an indication of the disposition of a potential summary judgment motion. *See Lucas*, 58 F.4th at 1143.

plausible claim for deliberate indifference under the Eighth Amendment against both Schrecongost and Kudlauskas.

### c.    Clearly Established Law

Because the court finds that Plaintiff has adequately alleged a deliberate indifference claim against Schrecongost and Kudlauskas, the court must evaluate whether the asserted right was clearly established at the time of their alleged conduct.

Consistent with the reasons discussed above, the court respectfully finds that every reasonable employee in a prison in the Tenth Circuit at the time of the alleged conduct here would have understood that a violation of the Eighth Amendment occurs when there is a denial of access to timely post-surgical care directed by the surgeon. It is clearly established in this Circuit that a prison official's "intentional interference with prescribed treatment may constitute deliberate indifference." *Ledoux v. Davies*, 961 F.2d 1536, 1537 (10th Cir. 1992) (citing *Estelle,* 429 U.S. at 104-05; *Martin v. Board of County Comm'rs of Pueblo County,* 909 F.2d 402, 406 (10th Cir. 1990) (recognizing that "deliberate indifference is shown not only by failure to provide prompt attention to the medical needs of a pre-trial detainee, but also by intentionally interfering with the treatment once prescribed") (quoting *Estelle*, 429 U.S. at 104-05)); *see also, e.g.*, *Prince v. Sheriff of Carter County*, 28 F.4th 1033, 1047–48 (10th Cir. 2022) (denying qualified immunity to a nurse who did not give prescribed medical care to an inmate); *Palmer v. Bd. of Comm'rs ex rel. Payne Cnty. Okla.*, 441 F. App'x 582, 584 (10th Cir. 2011) (recognizing that "[i]t has been clearly established since 1976 that a jailer's failure to act in accordance with prescribed medical instructions can give rise to an Eighth Amendment claim") (citing *Estelle,* 429 U.S. at 104–05; *Howard v. Dickerson*, 34 F.3d 978, 980–81 (10th Cir. 1994); *Ledoux*, 961

F.2d at 1537)); *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999) (reversing dismissal of deliberate indifference claim where plaintiff had alleged that he was denied medication the hospital had prescribed for him and that certain medically-recommended procedures were not performed).

The court therefore respectfully concludes that this Tenth Circuit precedent—published and reiterated in unpublished decisions as well—placed Schrecongost and Kudlauskas on notice that their alleged conduct unconstitutionally deprived Plaintiff of timely care for a serious medical need. Accordingly, the Motion is respectfully **denied** as to Claim One against Schrecongost and Kudlauskas.

### 2.    Claim Against Kaspar

Whether Plaintiff's pleading sufficiently alleges the subjective element as to Kaspar, the Health Services Administrator at BVCF, is a closer call. Ultimately, however, the court finds that it does.

Plaintiff asserts that Kaspar functioned in a gatekeeper role: as the Health Services Administrator, she "was in charge of all medical care and ensuring that inmates received appropriate and adequate medical care," and she "also made all decisions [about] which inmates are seen and where they are seen." ECF No. 53 ¶ 64. As the HSA, Plaintiff alleges that Kaspar was the recipient of an email, sent by Plaintiff's mother to the institution on some unidentified date in March 2022, stating that her son needed an x-ray of his foot "so they can do surgery to attach ligaments," and that he further "needs attention" because "he has pins or staples

protruding from his skin with blood . . .” *Id.* ¶¶ 85-86.[6] And the Complaint clearly alleges that Kaspar was a recipient of notes generated by Dr. Engel on April 27, 2022, in which Dr. Engel criticized the prison for not following her orders that Plaintiff be returned to her office earlier for removal of the pins and for a CT scan. ECF No. 53 ¶ 100 (averring that Engel's notes were "provided" to Kaspar, Schrecongost, and Kudlauskas).

The well-pleaded facts thus show that Kaspar acquired knowledge of Plaintiff's condition, including the necessity for him to be sent back to his surgeon for removal of the pins and for conducting the medical imaging that was required to assess whether he needed a second surgery. For the reasons articulated in the analysis of the claim against Schrecongost and Kudlauskas, Plaintiff's pleading likewise plausibly suggests that Kaspar had a duty in this situation—with Plaintiff's post-surgical wounds emitting a malodorous scent indicative of an infection—to ensure that he was sent to an outside medical professional capable of providing the care he needed. *See, e.g.*, *Lucas*, 58 F.4th at 1143; *Paugh*, 47 F.4th at 1159. He has plausibly alleged that Kaspar, like Schrecongost and Kudlauskas, consciously disregarded a substantial risk of serious harm to his health, and the law was clearly established at the time of Kaspar's conduct so as to enlighten every reasonable employee in a prison in the Tenth Circuit of the unconstitutionality of her actions.

---

[6] While the screenshot captured in the Complaint does not show Kaspar herself was the recipient of this email, ECF No. 53 85, the court draws all reasonable inferences from the pleading in Plaintiff's favor and assumes, for purposes of ruling on the Motion to Dismiss, that Kaspar saw it. Plaintiff also alleges, speculatively, that Schrecongost and Kudlauskas "would have" shared the concerns that Plaintiff conveyed to them with Kaspar. *Id.* ¶ 72. Whether or not they did, Plaintiff has sufficiently alleged that Kaspar acquired that information by other means.

For these reasons, the Motion is respectfully **denied** as to Claim One against Kaspar.[7]

### 3. Claim Against Castillo, Graham, and Armstrong

Plaintiff contends that each of these non-medical personnel violated his rights in precisely the same way, as reflected in these excerpted paragraphs from the Complaint:

> 59. When Mr. Kassal's March 16, 2022 follow up appointment and procedure came, Megan Castillo decided that it was too inconvenient to drive Mr. Kassal the two hours to Pueblo for his appointment and canceled this appointment.

> 61. When Mr. Kassal's March 16, 2022 follow up appointment and procedure came, Jennifer Graham decided that it was too inconvenient to drive Mr. Kassal the two hours to Pueblo for his appointment and canceled this appointment.

> 65. When Mr. Kassal's March 16, 2022 follow up appointment and procedure came, Ronald Armstrong decided that it was too inconvenient to drive Mr. Kassal the two hours to Pueblo for his appointment and canceled this appointment.

> 95. At various times throughout this two (2) month period, Megan Castillo, canceled Mr. Kassal's medical exams because Pueblo, a two (2) hour drive from Buena Vista, was inconvenient.

> 96. At various times throughout this two (2) month period, Jennifer Graham canceled Mr. Kassal's medical exams because Pueblo, a two (2) hour drive from Buena Vista, was inconvenient.

> 98. At various times throughout this two (2) month period, Ronald Armstrong canceled Mr. Kassal's medical exams because Pueblo, a two (2) hour drive from Buena Vista, was inconvenient.

*See* ECF No. 53. These repetitive allegations—proclaiming identical motivations of a desire to

---

[7] The court observes that, for the reasons set forth in the next section concerning the claim against Castillo, Graham, and Armstrong, it is not obliged to accept the veracity of the conclusory allegation that "Kaspar decided that it was too inconvenient to drive Mr. Kassal the two hours to Pueblo for his appointment and canceled this appointment." ECF No. 53 ¶ 63. Therefore, the court countenances no deliberate indifference claim against Kaspar on that basis.

avoid "inconvenience" on the part of three different individuals at precisely the same time—are wholly conclusory and not entitled to the assumption of truth. *See Iqbal*, 556 U.S. at 681 ("It is the conclusory nature of respondent's allegations . . . that disentitles them to the presumption of truth."). As the Tenth Circuit has articulated the point, "an allegation . . . not supported by factual content . . . is merely a conclusion of law [and] [u]nder *Twombly* and *Iqbal*, . . . is insufficient, and not entitled to a presumption of truth." *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1219 (10th Cir. 2011). Dismissal of the claim against Castillo, Graham, and Armstrong is warranted on this basis alone. However, even setting aside this fundamental pleading defect and crediting these duplicative, conclusory assertions, the claim against these Defendants would still fail because the allegations do not satisfy the subjective component of deliberate indifference.

Plaintiff has alleged no facts plausibly evincing the existence of the requisite culpable mindset on the part of any of these prison employees, such that the court could reasonably infer that any one of them "[knew] of and disregard[ed] an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. Neither do these unadorned assertions, copied verbatim from one to the next Defendant, plausibly indicate that each member of this collective was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and that any of them actually "[drew] the inference." *See id.* Plaintiff contends that Castillo, Graham, and Armstrong (along with the other three Individual Defendants) "knew that [he] required further medical care, including that his wounds around his ankle were discolored and that pins were protruding from his skin," ECF No. 53 ¶ 98, but that assertion, too, is bare and conclusory and bereft of factual support. This court cannot reasonably infer from it that these non-medical providers would have acquired actual knowledge of the medical condition of one inmate in an

institution housing hundreds[8] or that they would have had the authority to delve into Plaintiff's confidential medical records.

Plaintiff does not claim that he personally interacted with any of these three Individual Defendants, nor does he allege any other facts plausibly supporting the contention that they carried out their scheduling duties based on their personal "convenience" and a concerted desire to avoid a "two hour drive" to Pueblo.[9] Indeed, the only allegations of a specific communication between Plaintiff and any one of these three Defendants is his April 17, 2022 grievance, on which Graham, the "medical scheduler," was allegedly copied. *Id.* ¶¶ 6, 88. Even if Graham saw this grievance—which is not suggested on the face of the document, ECF No. 58-1—it came a month after the scheduled appointment with Dr. Engel and ascribes no interference by Graham (or any other individual) with his medical appointments. That communication does not plausibly suggest that Graham (or, for that matter, Castillo or Armstrong) possessed a culpable state of mind by actually apprehending an excessive risk to his health and then deliberately ignoring that understood risk.

In finding that Plaintiff's conclusory and duplicative contentions fail to plausibly allege the subjective element of deliberate indifference, the court is struck by what is *not* contained in Plaintiff's pleading. Utterly absent from the Complaint is any factual description of what occurred at the time of the cancellation of the appointment with Dr. Engel on March 16. He does not allege, for example, when he found out about the cancellation; who told him; and what they

---

[8] BVCF currently houses over eight hundred inmates. *See* Statistics | Colorado Department of Corrections (last visited September 28, 2025).

[9] Plaintiff does not allege that Castillo, Graham, or Armstrong would personally have driven him to Pueblo.

said. Was he informed, for example, that this was the doing of Castillo, Graham, Armstrong, or someone else? If so, what exactly was he told? Put simply, the pleading is silent on each of these critical points, which are factual "details [he] should know and could properly plead to satisfy the plausibility requirement." *Khalik*, 671 F.3d at 1194 (finding inadequate pleading rendered claims implausible and affirming dismissal). Absent these facts, no reasonable inference of the criminally reckless disregard necessary to allege the subjective element can be derived from the pleading. *See Farmer*, 511 U.S. at 837, 839.

Because Plaintiff's allegations are insufficient to support a claim of deliberate indifference against Castillo, Graham, or Armstrong—and Kaspar, too, to the extent she is enveloped in this collective claim, *see* ECF No. 53 ¶ 63—each is entitled to qualified immunity. *See Andersen*, 79 F.4th at 1163 (if the court "conclude[s] that the plaintiff has not met his burden as to either part of the two-prong inquiry, [the court] *must grant qualified immunity* to the defendant") (emphasis added). Therefore, the claim against them is **dismissed with prejudice**.[10]

## C.    Failure to Provide Any Post-Surgical Physical or Occupational Therapy (Claim Two)

Plaintiff cordoned off one aspect of the alleged deliberate indifference of Schrecongost, Kudlauskas, and Kaspar and made it a distinct claim, and so the court follows suit in addressing it separately. The analysis of the alleged deliberate indifference delineated in Claim One applies equally here and similarly compels the conclusion that Plaintiff has sufficiently alleged the

---

[10] The court will dismiss the claim against Castillo, Graham, and Armstrong with prejudice because they are entitled to qualified immunity. *See Clark v. Wilson,* 625 F.3d 686, 692 (10th Cir. 2010) (instructing the district court to grant defendants' motion to dismiss based on qualified immunity "with prejudice"); *McCrary v. Jones*, 2015 WL 873641, at *6 (W.D. Okla. Feb. 27, 2015) (dismissing claim with prejudice where defendant was entitled to qualified immunity).

subjective element of such a claim in accordance with clearly established law, disentitling the Individual Defendants to qualified immunity at this juncture.

In Claim Two, Plaintiff alleges that these three Individual Defendants failed to adhere to Dr. Engel's directive that he receive physical and occupational therapy. ECF No. 53 ¶ 37; *id.* ¶¶ 101-103 (alleging that Kaspar, Schrecongost, and Kudlauskas were aware of Engel's "referral for physical therapy" at the time he entered BVCF and "yet refused to provide him such care"). After the surgical pins and his arm cast were removed in late April 2022, Plaintiff "continued to request physical or occupational therapy as prescribed by his surgeon, Dr. Engel and as contained in both his medical notes and treatment notes provided to the [BVCF]." *Id.* ¶ 105; *id.* ¶ 90 (in an April 22, 2022 email from Plaintiff's mother to "CDOC," stating "that in spite of [Plaintiff's] treatment plan requiring physical or occupational therapy, he was receiving none"). Plaintiff's requests were ignored by Kaspar, Schrecongost and Kudlauskas, *id.* ¶¶ 106-108, resulting in significant pain and compromise to his long-term functioning. *Id.* ¶¶ 103, 104. Plaintiff avers that he was never provided a physical therapist from March 2022 through his release from custody in August 2022, with consequential impact: his "ankle and wrist are severely limited and medical diagnoses have determined that he will never regain complete function as a result of the lack of access to physical therapy in the six (6) months following his surgery." *Id.* ¶ 112.

The court incorporates here its analysis of Claim One, as brought against Schrecongost, Kudlauskas, and Kaspar. The Complaint plausibly alleges the subjective component: acting as gatekeepers, these defendants had a duty to facilitate surgeon-ordered therapy by securing access to an outside provider, and their failure to do so—despite notice—permits a reasonable inference of conscious disregard of a substantial risk of serious harm to Plaintiff's health attendant on his

inability to pursue therapy following surgery to repair breaks of multiple major bones. To reiterate again a previously-articulated, but essential, point: the law in Tenth Circuit has long been established that "intentional interference with prescribed treatment may constitute deliberate indifference." *Ledoux*, 961 F.2d at 1537.

Because Plaintiff has plausibly alleged that Defendants violated clearly established law attendant on their refusal to facilitate his access to prescribed physical therapy in the aftermath of surgery (at significant detriment to his long-term functioning), Schrecongost, Kudlauskas, and Kaspar are not sheltered by the doctrine of qualified immunity at this stage. The Motion to Dismiss therefore is **denied** insofar as it seeks dismissal of Claim Two.

## II.    Disability Discrimination Claims (Claims Three and Four)

Plaintiff alleges that, following his February 2022 surgery, CDOC excluded him from the Take TWO residential re-entry program and refused reasonable modifications (e.g., assignment to compatible work and continued residence in Take TWO housing), thereby denying enhanced living conditions, off-site work and wages, and structured re-entry support, in violation of Title II of the ADA, 42 U.S.C. § 12132, and § 504 of the RA, 29 U.S.C. § 794(a). *See* SAC ¶¶ 43–51 (transfer out of Take TWO and statement he could not continue because of disability), ¶¶ 46–48 (wheelchair, inability to walk, limited use of dominant hand), ¶¶ 116–118 (months of requests; reinstatement within a week after invoking the ADA).

Because Title II and § 504 apply the same substantive standards, the court analyzes them together while noting § 504's additional requirements (receipt of federal funds and "solely by reason of" causation). *Dixon v. Bd. of Trs. of Metro. State Univ. of Denver Colorado*, No. 23-cv-00606-RMR-STV, 2023 WL 11862296, at *4 (D. Colo. Oct. 27, 2023), *report and*

*recommendation adopted*, No. 23-cv-00606-RMR-STV, 2023 WL 11862298 (D. Colo. Nov. 14, 2023). The analysis proceeds in five parts: (1) disability and qualification; (2) exclusion/denial of benefits and meaningful access (including reasonable modifications); (3) causation; (4) intentional discrimination/deliberate indifference so as to obtain compensatory damages; and (5) remedies and sovereign immunity.

### A.  Governing Law and Pleading Standard

Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Because "analysis of a claim under Title II of the ADA is identical to an analysis under the Rehabilitation Act," the court analyzes the ADA and RA claims together, with the understanding that the RA additionally requires that the defendant receive federal funds. *See Kimble v. Douglas Cty. Sch. Dist. RE-1*, 925 F. Supp. 2d 1176, 1182 (D. Colo. 2013) (citing *Nielsen v. Moroni Feed Co.*, 162 F.3d 604, 608 n.7 (10th Cir. 1998)); *Anderson v. Colo. Dep't of Corr.*, 848 F. Supp. 2d 1291, 1300 n.2 (D. Colo. 2012). It is well-settled that state correctional departments and their programs are "public entities" covered by Title II and § 504. *See Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 209–12 (1998); *see also Marks v. Colo. Dep't of Corr.*, 976 F.3d 1087, 1094–96 (10th Cir. 2020) (applying Title II/RA to prison re-entry programming).

"To state a claim under Title II, the plaintiff must allege that (1) he is a qualified individual with a disability, (2) who was excluded from participation in or denied the benefits of a public entity's services, programs, or activities, and (3) such exclusion, denial of benefits, or discrimination was by reason of a disability." *Robertson v. Las Animas Cty. Sheriff's Dep't*, 500

F.3d 1185, 1193 (10th Cir. 2007). "Based on the second element, courts have recognized two types of claims: (1) exclusion from denial of benefits and (2) discrimination." *J.V. v. Albuquerque Pub. Sch.*, 813 F.3d 1289, 1295 (10th Cir. 2016). "Courts have recognized three ways to establish a discrimination claim: (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation." *Dixon*, 2023 WL 11862296, at *4.

## B.  "Qualified Individual with a Disability"

The first question is whether Plaintiff has plausibly alleged that his post-surgical injuries "substantially limit" one or more major life activities, *see* 42 U.S.C. § 12102(1)(A), as compared to most people in the general population, *see* 29 C.F.R. § 1630.2(j)(1)(ii) (proper comparator is the "general population"). Although the phrase "substantially limits" remains in the statute following the Americans with Disabilities Act Amendments Act of 2008 ("ADAAA"), the implementing regulations now state that an impairment "need not prevent, or significantly or severely restrict, the individual from performing a major life activity" to qualify. 29 C.F.R. § 1630.2(j)(1)(ii). Further, the regulations explain that this phrase: (1) is to be construed broadly in favor of expansive coverage, 29 C.F.R. § 1630.2(j)(1)(i); (2) "is not meant to be a demanding standard," *id.*; (3) is a threshold inquiry that "should not demand extensive analysis," *id.* § 1630.2(j)(1)(iii); (4) requires a lower degree of functional limitation than under pre-amendment law, *id.* § 1630.2(j)(1)(iv); and (5) does not require scientific, medical, or statistical evidence, *id.* § 1630.2(j)(1)(v). The regulations likewise clarify that an impairment "lasting or expected to last fewer than six months can be substantially limiting," depending on severity and functional effect. *See* 28 C.F.R. § 35.108(d)(1)(ix). Thus, neither the label "temporary" nor the diagnostic name (e.g., "fracture") is dispositive; the question is the extent to which the impairment substantially

limits one or more major life activities (e.g., walking, standing, manual tasks, self-care) during the relevant period.

The SAC alleges months-long limitations: wheelchair dependence, a non-weight-bearing ankle, and markedly reduced use of the dominant hand. SAC ¶¶ 37–38, 45–48. Those limitations implicate walking, standing, self-care, and manual tasks—quintessential "major life activities." The SAC also pleads enduring loss: "permanent loss of function" in the ankle and wrist and a medical assessment that Plaintiff "will never regain complete function," allegedly tied to delayed or denied post-operative therapy. *Id*. ¶¶ 47–48, 112, 124, 134. At the pleading stage, those allegations plausibly establish a disability under the ADA/RA. They also answer CDOC's refrain that a "broken limb" is not a disability. Even setting aside CDOC's reliance on guidance describing "minor, nonchronic condition[s] of short duration . . . such as . . . a broken limb" (Reply at 10), and their out-of-circuit authorities treating uncomplicated fractures as non-disabling (Motion at 14–15), Plaintiff does not allege a routine, quickly-resolved fracture; he pleads months-long wheelchair dependence and lasting functional loss, which suffices to allege a disability at the pleading stage.

The SAC likewise supports the conclusion that Plaintiff was "qualified." He was already participating in Take TWO pre-injury and sought to continue in that program with modest modifications. Within a week of invoking the ADA in a grievance, CDOC reinstated Plaintiff and assigned him tasks (e.g., painting fences) compatible with his restrictions. SAC ¶¶ 115–118. Those facts permit a plausible inference that, with reasonable modifications, Plaintiff met the essential eligibility requirements of the program.

### C.  Exclusion/Denial of Benefits and "Meaningful Access" (Corrections Specific)

Title II and § 504 protect not only physical access to a facility, but also meaningful access to the benefits a public program confers. *See Robertson*, 500 F.3d at 1195–96 (Title II requires "meaningful access," which may necessitate reasonable modifications). In the corrections arena, the Department of Justice's prison-specific rule confirms that inmates with disabilities must be afforded an "equal opportunity to participate in or benefit from" services, programs, and activities, and must not be assigned to inappropriate housing by reason of disability. 28 C.F.R. § 35.152(b)(1), (2). Prisons and reentry initiatives are "services, programs, or activities" within the statute's reach. *Yeskey*, 524 U.S. at 209–12; *Marks*, 976 F.3d at 1094–96. The Department of Justice's corrections regulation underscores that prisons must afford individuals with disabilities equal opportunity to participate in services, programs, and activities and may not make housing or placement decisions that, by reason of disability, needlessly deny such access. 28 C.F.R. § 35.152(b)(1)–(2). The SAC alleges that very thing happened to Plaintiff here.

According to the SAC, Take TWO provides enhanced living conditions, community-based work opportunities, wages, and structured re-entry support (e.g., programming relevant to parole and community transition). SAC ¶¶ 49–56, 139–45. By comparison, removal from Take TWO allegedly placed Plaintiff in more restrictive housing and eliminated access to off-site employment and associated re-entry benefits for several months. *Id*. ¶¶ 49–56, 115–18. Plaintiff further alleges he was told he could not remain in Take TWO "because of his physical condition" and that this categorical stance persisted notwithstanding his repeated requests to continue with adjustments—until he invoked the ADA; once he did, CDOC reinstated him "within a week." *Id*. ¶¶ 49–56, 115–18. Taking these allegations as true, they plausibly describe (1) exclusion from a

35

covered program and (2) denial of program benefits (enhanced housing, work, wages, and re-entry support) by reason of disability, not merely inconvenience or medical judgment. *See Marks*, 976 F.3d at 1095–96. This is not a case about a clinical judgment regarding treatment, rather, the alleged wrong is programmatic: denial of access to a reentry program itself and its attendant benefits because of an inmate's functional limitations. Nor does his later reinstatement negate the injury; to the contrary, swift reinstatement upon the invocation of the ADA supports the inference that earlier months of exclusion reflect a failure to afford meaningful access, not an inevitability dictated by program design.

Two points underscore the sufficiency of Plaintiff's pleading: First, temporal scope: Plaintiff alleges a multi-month exclusion, not a momentary interruption. *See* SAC ¶¶ 49–56, 115–18. Second, substantive deprivation: the alleged loss includes wages and structured transition support, benefits cognizable under Title II and § 504. *Id*. ¶¶ 139–45.

### D.  Failure-to Accommodate (Reasonable Modification)

A public entity must make "reasonable modifications" in policies, practices, or procedures when necessary to avoid disability-based discrimination, unless it can show the modification would fundamentally alter the service or impose an undue burden. *See* 28 C.F.R. §§ 35.164, 135.130(b)(7). The duty arises when the need is obvious or the individual requests it. *J.V.*, 813 F.3d at 1299–1300; *Robertson*, 500 F.3d at 1195–96. Defendants contend Plaintiff "does not allege that he asked for an accommodation and staff simply ignored him; in fact, he was restored to work after he had healed." Motion at 16 (citing SAC ¶¶ 116–18). The SAC, however, alleges months of requests to remain in Take TWO with adjusted duties, followed by reinstatement within a week once he invoked the ADA—allowing the court to infer both notice

36

and refusal during the exclusion period. *See* SAC ¶¶ 49–56, 115–18; *see also* Pl.'s Resp., ECF No. 63 at 13 (arguing CDOC knew accommodations were available but withheld them).

The SAC thus plausibly alleges both notice and refusal. For months, Plaintiff asked to remain in Take TWO with adjustments tailored to his limitations (modified duties accommodating wheelchair use and reduced grip and weight-bearing ability), and CDOC refused—only to reinstate him promptly once he expressly mentioned the ADA. SAC ¶¶ 49–56, 115–18. That sequence supports reasonable inferences that (1) CDOC knew of the need for accommodation (obvious from Plaintiff's wheelchair/non-weight-bearing status and repeated requests); (2) feasible modifications were available (as evidenced by immediate reinstatement and assignment to compatible tasks—e.g., painting fences—once CDOC engaged with the ADA request); and (3) CDOC refused those modifications during the exclusion period. At the Rule 12(b)(6) stage, Plaintiff need not prove the precise contours of each modification; he must plausibly allege facts demonstrating a facially reasonable modification and a refusal to implement that modification. *See Aubrey v. Koppes*, 975 F.3d 995, 1005 (10th Cir. 2020). The modifications alleged here—temporary duty reassignment within the program, mobility-compatible work, and continued program placement with reasonable restrictions—are the type of incremental adjustments courts routinely deem plausibly reasonable, particularly where the institution later implements substantially similar measures. Whether any proposed modification would have caused a "fundamental alteration" or "undue financial and administrative burden," *see* 28 C.F.R. § 35.164, is a fact-intensive inquiry not suitable for resolution on the pleadings and, notably, not developed in CDOC's Motion.

### E. Intentional Discrimination (Compensatory-Damages Standard)

To recover compensatory damages under § 504 (and, where permitted, Title II), Plaintiff must show intentional discrimination, which the Tenth Circuit measures by deliberate indifference: (1) knowledge that harm to a federally protected right is substantially likely and (2) failure to act. *Barber ex rel. Barber v. Colorado Dep't of Revenue*, 562 F.3d 1222, 1228-29 (10th Cir. 2009); *see also Powers v. MJB Acquisition Corp.*, 184 F.3d 1147, 1153 (10th Cir. 1999). The inquiry targets awareness of the risk of violating statutory access rights, not Eighth Amendment medical negligence. *See Barber*, 562 F.3d at 1228–29 (adopting the deliberate indifference standard—"knowledge that a harm to a federally protected right is substantially likely, and a failure to act"—and emphasizing the standard requires more than negligence) (citing *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001)); *Havens v. Colo. Dep't of Corr.*, 897 F.3d 1250, 1264–66 (10th Cir. 2018) (reaffirming *Barber*; deliberate indifference requires knowledge plus failure to act and "more than negligent" conduct); *see also Powers*, 184 F.3d at 1153 (intent may be inferred from deliberate indifference to the strong likelihood that pursuing the challenged policy will violate federally protected rights); *Nordwall v. PHC–Las Cruces, Inc.*, 960 F. Supp. 2d 1200, 1212–13 (D.N.M. 2013) (collecting cases and finding that even gross negligence does not amount to deliberate indifference; applying deliberate indifference standard and finding no intentional discrimination).

The SAC plausibly alleges both *Barber* prongs. On knowledge, Plaintiff alleges officials knew of his mobility and upper-extremity limitations (wheelchair, non-weight-bearing, reduced hand function), knew he was seeking to remain in Take TWO with adjusted duties, and knew exclusion would deny him the benefits of the program. SAC ¶¶ 37–38, 45–56, 115–18, 139–45.

On failure to act, Plaintiff alleges that despite months of requests, and without proposing an alternative path to remain in the program, officials maintained a categorical no-participation-because-of-physical-condition stance until he cited the ADA, whereupon CDOC reinstated him within a week and assigned him work compatible with his limitations. *Id*. ¶¶ 49–56, 115–18.

At the pleading stage, courts exercise caution before disposing of intent questions. *See Randle v. City of Aurora*, 69 F.3d 441, 453 (10th Cir. 1995). The allegations here—evincing direct linkage of exclusion to disability, repeated accommodation requests, and swift reinstatement when ADA rights were invoked—suffice to cross the plausibility threshold for deliberate indifference.

### F.  Causation: "By Reason of" (ADA) and "Solely by Reason of" (RA)

The ADA requires that the exclusion or denial occur "by reason of" disability, while the RA requires that it occur "solely by reason of" disability. *Robertson*, 500 F.3d at 1193. The Tenth Circuit has made clear that Title II's "by reason of" language imports but-for causation, whereas the RA retains its "solely by reason of" standard. *See*, *e.g.*, *Crane v. Utah Dep't of Corr.*, 15 F.4th 1296, 1313 (10th Cir. 2021). On a Rule 12(b)(6) motion, the question is whether the SAC plausibly alleges the disability-based causal link.

It does. Plaintiff alleges he was expressly told he could not continue in Take TWO because of his physical condition; that he was moved from the program's less-restrictive housing and lost access to community work and re-entry benefits; and that after he pointed to the ADA, he was reinstated in short order with duties adjusted to his limitations. SAC ¶¶ 49–56, 115–18, 139–45. Those allegations plausibly plead that disability was the but-for reason for exclusion (ADA) and, at this early stage, also suffice to plausibly allege that no independent, non-disability

ground motivated his months-long ban from the program (RA). CDOC points to no alternative programmatic ground—such as misconduct, security classification change, or loss of eligibility—to explain the exclusion period, and none is apparent from the pleading. *See Marks*, 976 F.3d at 1095–96 (recognizing that denial of reentry-program benefits may be "by reason of" disability when the barrier is the inmate's limitations and the absence of modifications). If discovery reveals other, non-disability reasons that independently motivated the exclusion decision, CDOC may renew its causation arguments at summary judgment. On the face of the SAC, however, causation is plausibly alleged under both statutes.

### G. Allegations of Permanent Impairment and the "Broken Bone" Contention

The ADAAA directs that "disability" be construed broadly and that "substantially limits" is "not meant to be a demanding standard." *See* 29 C.F.R. § 1630.2(j)(1)(ii); 42 U.S.C. § 12102(4)(A)–(B). Title II's regulation likewise makes clear that an impairment lasting or expected to last fewer than six months can be substantially limiting, depending on its severity and functional effect. 28 C.F.R. § 35.108. Thus, permanence is not required to plead an actual disability; what matters is the degree to which the impairment limits major life activities during the relevant period.

That said, Plaintiff's allegations of permanent impairment materially reinforce the disability element. Beyond months of wheelchair dependence, non-weight-bearing status, and dominant-hand limitations, the SAC pleads "permanent loss of function" in the ankle and wrist and a medical assessment that Plaintiff "will never regain complete function." SAC ¶¶ 37–38, 45–48, 112, 124, 134. At the pleading stage, those are factual assertions—not bare conclusions— and they move this case well beyond generalized "broken limb" examples aimed at short-term,

uncomplicated fractures. In short, even without permanence, the functional limits alleged here would be enough to plausibly plead a disability under the ADA/RA; the additional allegation of ongoing functional loss only strengthens that showing.[11]

### G. Sovereign Immunity and Remedies

Two remedial notes guide later stages of this action. First, by accepting federal financial assistance, a state waives Eleventh Amendment immunity for § 504 claims. 42 U.S.C. § 2000d-7(a)(1); *see Arbogast v. Kansas Dep't of Labor*, 789 F.3d 1174, 1182–83 (10th Cir. 2015). Second, in evaluating Title II damages against a state, a claim-by-claim analysis is required: (1) identify the Title II violation; (2) determine the extent to which the same conduct also violates the Fourteenth Amendment; and (3) for any Title II-only conduct, assess whether Congress' abrogation is valid under the congruence-and-proportionality test set forth in *Tennessee v. Lane*, 541 U.S. 509, 520-34 (2004). *See United States v. Georgia*, 546 U.S. 151, 159 (2006). The court therefore reserves any ruling on the impact of the Eleventh Amendment on Title II damages pending a developed factual record.

As to categories of damages, punitive damages are unavailable under the ADA/RA, and emotional distress damages are unavailable under Spending Clause statutes like § 504. *See*

---

[11] On this record, dismissal would be premature. The reasonableness of proposed modifications, causation under Title II and § 504, and the deliberate-indifference intent standard are all fact-intensive inquiries ill-suited to resolution on a Rule 12(b)(6) motion. *See Aubrey*, 975 F.3d at 1005–07 (plaintiff need only show a *facially* reasonable accommodation; reasonableness is typically a fact question); *Robertson*, 500 F.3d at 1195–96 (meaningful-access duty may require modifications); *Randle*, 69 F.3d at 453 (question of intent best left for a jury). Declining to dismiss the claims now obviously does not entitle Plaintiff to judgment; it simply permits the claims to proceed to discovery. CDOC remains free to renew these arguments on a developed record.

*Barnes v. Gorman*, 536 U.S. 181, 189–90 (2002); *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 230 (2022). Economic losses (e.g., lost program wages/benefits) are potentially recoverable upon proof of intentional discrimination under § 504.

### H. Prospective Relief and Mootness

Plaintiff's requests for forward-looking injunctive or declaratory relief directed to CDOC conditions or programmatic decisions (including placement in, or accommodation within, Take TWO) are moot in light of his release to parole. *See* Motion, ECF No. 58 at 15. In the Tenth Circuit, a transfer or release from custody ordinarily moots prospective-relief claims because there is no ongoing injury to redress. *Jordan v. Sosa*, 654 F.3d 1012, 1027–28 (10th Cir. 2011); *McAlpine v. Thompson*, 187 F.3d 1213, 1215–16 (10th Cir. 1999); *Green v. Branson*, 108 F.3d 1296, 1299–1300 (10th Cir. 1997). No exception to mootness would appear to apply under these circumstances: the "capable of repetition" doctrine requires a reasonable expectation the same plaintiff will face the same action again, which the merely theoretical possibility of reincarceration does not satisfy. *Jordan*, 654 F.3d at 1033; *McAlpine*, 187 F.3d at 1216; *see Murphy v. Hunt*, 455 U.S. 478, 482 (1982) (per curiam). Nor is "voluntary cessation" applicable where mootness stems from the plaintiff's release rather than a reversible policy shift. *Jordan*, 654 F.3d at 1025–26.

By contrast, Plaintiff's retrospective damages claims based on past exclusion from Take TWO and the denial of reasonable modifications are not moot. Damages redress a completed injury and remain a live controversy. *Rhodes v. Stewart*, 488 U.S. 1, 4 (1988) (per curiam); *Green*, 108 F.3d at 1300; *Jordan*, 654 F.3d at 1024. The SAC pleads a closed period of exclusion in 2022 with concrete harms—loss of lower-security housing outside the prison "fence" and off-

site work, wages, and support for structured reentry—before Plaintiff's reinstatement and release. *See* SAC ¶¶ 49–56 (removal and lost benefits), ¶¶ 115–18 (reinstatement "within a week" after ADA invocation), ¶¶ 139–45 (benefits identified). Those allegations sustain the ADA/RA damages claims notwithstanding the mootness of forward-looking relief.

In sum, taking the well-pleaded facts in the SAC as true, Plaintiff plausibly alleges disability, qualification (with reasonable modifications), exclusion from and denial of benefits of a public program, and deliberate indifference sufficient to pursue compensatory damages under Title II and § 504. The Motion to Dismiss is **denied** insofar as it seeks dismissal of Claims Three and Four.

## CONCLUSION

In accordance with the foregoing analysis, Defendants' Motion to Dismiss (ECF No. 58) is respectfully **GRANTED IN PART** and **DENIED IN PART**:

1. Claim One is **DISMISSED WITH PREJUDICE** as to Defendants Castillo, Graham, and Armstrong. Claim One **PROCEEDS** against Defendants Kudlauskas, Schrecongost, and Kaspar.

2. Claim Two **PROCEEDS** against Defendants Kaspar, Schrecongost, and Kudlauskas.

3. Claims Three (ADA Title II) and Four (Rehabilitation Act § 504) **PROCEED** against Defendant CDOC.

DATED: September 30, 2025        BY THE COURT:

_____
Susan Prose
United States Magistrate Judge